IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 30765-4-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MELODY LYNN WRIGHT, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, C.J. — Melody Wright appeals her conviction of 1 count of first

degree theft and 10 counts of Medicaid fraud arising from her submission of false

telephonic time invoices for in-home care provided to her mother. She challenges the

sufficiency of the evidence, asserts an equal protection violation, and contends that the

trial court abused its discretion in finding that her convictions of first degree theft and

Medicaid fraud did not encompass the same criminal conduct. Finding sufficient

evidence and no error or abuse of discretion, we affirm.

FACTS AND PROCEDURAL BACKGROUND

In May 2001, Melody Wright signed a four-year contract with the Washington

Department of Social and Health Services (DSHS) to provide in-home care services for

her mother, Donna Siegfried, to be paid for by the Medicaid-funded Community Options

Program Entry System (COPES). Medicaid is a jointly funded federal and state medical assistance program under which the federal government reimburses state governments for a portion of the costs of providing medical assistance to low income individuals. *Wash. State Hosp. Ass'n v. State*, 175 Wn. App. 642, 644, 309 P.3d 534 (2013) (citing 42 U.S.C. § 1396(a)-(e)). Ms. Siegfried's needs for in-home services were assessed by employees of DSHS, which authorized her to receive 188 hours of in-home care a month. Each month thereafter, Ms. Wright submitted invoices for payment for the full 188 hours telephonically, by calling in to a system and entering specific information when prompted by a recording. She was paid accordingly.

In April 2005, Ms. Wright signed a second four-year contract to care for her mother. Early in the term of the new contract, a COPES case manager met with Ms. Wright and her mother for a reassessment of Ms. Siegfried's needs. The reassessment suggested that Ms. Siegfried needed far less in-home care than the 188 hours, so her authorized in-home care hours were reduced to 94 hours a month. Ms. Wright and her mother successfully appealed the reduction, obtaining reinstatement of the 188 authorized hours, and successfully represented a need for the 188 hours in the next reassessment. The case manager assigned to Ms. Siegfried remained skeptical about her care needs asserted on appeal and thereafter, suspecting that her need for 94 hours as assessed in 2005 was more accurate.

In March 2008, an investigator with the Medicaid Fraud Control Unit of the Washington Attorney General's office received a complaint that Ms. Wright was claiming care hours not worked for Ms. Siegfried, while working two other jobs. The investigator requested timekeeping records for Ms. Wright from a private retirement home where he learned she was employed full time and asked that employees administering the COPES contract require Ms. Wright to provide time sheets reflecting her time spent providing care for Ms. Siegfried.

In April 2008, Ms. Wright was asked by employees of DSHS to provide time sheets for the period from May 2007 to April 2008. Ms. Wright and DSHS employees dispute whether Ms. Wright had been provided with time sheets a year earlier and told to keep an ongoing record of her hours worked; in any event, she had not kept a record.

Ms. Wright was therefore provided with time sheets to complete after-the-fact. She initially filled them out by indicating that she had provided in-home care either 10 or 24 hours each day of the month. As completed, they reflected an hourly total far in excess of 188 hours a month. Ms. Wright was notified that the time sheets were unacceptable and was told to submit new time sheets that reflected her best record of the 188 hours a month she claimed to have worked. Ms. Wright submitted a second set in response. Many of the hours reported by Ms. Wright on the second set of time sheets proved to overlap with the time sheets she had submitted to her private employer.

In light of the discrepancy, Ms. Siegfried was asked to come into the attorney general's office to speak with an investigator. She did, accompanied by Ms. Wright. Both women agreed to speak with investigators after being given *Miranda*[1] warnings and both affirmed, when asked, that the second set of time sheets accurately reflected the hours Ms. Wright had worked providing in-home care. When asked, both annotated and initialed the sheets as "accurate." Report of Proceedings at 397, 402-03. Ms. Wright was then confronted with the time sheets submitted to her private employer and, when questioned about the many overlapping hours, began to cry, telling the investigator, "'my husband left me and I have kids to take care of and I'm going to lose my house. I'm in debt.'" *Id.* at 403. She offered no other explanation for the inconsistent hours on her time sheets and later submitted a written statement saying the hours she turned in were not correct.

Ms. Wright was eventually charged with first degree theft and with 10 counts of Medicaid false statement, a type of Medicaid fraud provided by RCW 74.09.230.

At trial, Ms. Wright testified that she had worked the 188 hours claimed each month during the charging period, but not necessarily at the times she later reported on her time sheets. The jury did not believe her, finding her guilty as charged. The court ordered $12,605 in restitution and, sentencing her as a first-time offender, accepted the

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

State's recommendation that it impose a sentence of 30 days converted to 240 hours of community service. She appeals.

## ANALYSIS

### I. Sufficiency of Evidence: First Degree Theft

Ms. Wright's first assignment of error is to the allegedly insufficient evidence supporting her conviction of first degree theft. The gist of her argument is that the State's theory and evidence were directed to a means of committing first degree theft that it did not charge. She focuses on the difference between two alternative means of committing first degree theft provided by RCW 9A.56.020(1): what is commonly referred to as "theft by taking," provided by the statute's subsection (a), and what is commonly referred to as "theft by deception," provided by its subsection (b). *State v. Smith*, 115 Wn.2d 434, 438, 798 P.2d 1146 (1990) (citing *State v. Southard*, 49 Wn. App. 59, 741 P.2d 78 (1987)). She argues that the theft by taking that the State elected to charge required that it prove a trespass, which it did not undertake to do. She argues that her conviction of theft by taking absent any evidence of a trespass denied her due process.

In order to prove that Ms. Wright committed first degree theft under RCW 9A.56.020(1)(a), the State was required to prove that during the charging period she "wrongfully obtained or exerted unauthorized control over property of another";[2] that the

---

[2] To "wrongfully obtain" or "exert unauthorized control" means:
(a) To take the property or services of another;

property exceeded $1,500 in value; that she intended to deprive the other person of the property; that her acts were part of a common scheme, plan, or a continuing course of conduct; and that her acts occurred in the state of Washington. Clerk's Papers (CP) at 186 (Jury Instruction 7).

When reviewing a sufficiency of the evidence challenge, we ask whether, "after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Hosier*, 157 Wn.2d 1, 8, 133 P.3d 936 (2006).

Relying on *State v. Thorpe*, 51 Wn. App. 582, 754 P.2d 1050 (1988), Ms. Wright contends that trespass is a required element of theft by taking under RCW 9A.56.020(1)(a). In *Thorpe*, the State proved that the defendants in that case knowingly submitted inflated invoices to the State for meat delivered to a state institution, and that

---

(b) Having any property or services in one's possession, custody or control as bailee, factor, lessee, pledgee, renter, servant, attorney, agent, employee, trustee, executor, administrator, guardian, or officer of any person, estate, association, or corporation, or as a public officer, or person authorized by agreement or competent authority to take or hold such possession, custody, or control, to secrete, withhold, or appropriate the same to his or her own use or to the use of any person other than the true owner or person entitled thereto; or
(c) Having any property or services in one's possession, custody, or control as partner, to secrete, withhold, or appropriate the same to his or her use or to the use of any person other than the true owner or person entitled thereto, where the use is unauthorized by the partnership agreement.
Former RCW 9A.56.010(19)(a)-(c) (2006).

they received payment therefor. The State submitted the case to the jury on alternative theories, one of which was theft by taking. The defendants argued that while the evidence would support theft by deception, it did not support theft by taking and the court agreed. Construing the statute as "incorporat[ing] what were several distinct crimes under former statutory and common law," the court stated that "[o]ne element of wrongfully obtaining, or taking, property (including money) under RCW 9A.56.020(1)(a) is a trespass." *Id.* at 585. Because there was no evidence of a trespass and no way of knowing the basis for the jury's verdict, the court reversed the conviction of first degree theft and remanded that charge for a new trial.

Ms. Wright correctly characterizes *Thorpe* but fails to take into consideration a later and controlling decision, *Smith*, 115 Wn.2d 434, in which the Washington Supreme Court disapproved of cases that, like *Thorpe*, had required proof of a trespass to establish theft by taking. The Court of Appeals decision in *Smith* had assumed as much, but the Supreme Court disagreed, explaining that while statements to that effect had been made in some earlier decisions, as dicta or otherwise,

> [t]respass is not required for statutory theft by taking. "The Legislature may define crimes. Where it does so, its statutory definition may supersede common law." . . . Both this court and the Court of Appeals have affirmed convictions for theft by taking under RCW 9A.56.020(1)(a) without requiring evidence of a trespass. [A]ny other decision inferring the contrary is disapproved.

7

*Id.* at 441 (citations omitted) (quoting *State v. Komok*, 113 Wn.2d 810, 814, 783 P.2d 1061 (1989)).

Evidence of theft by taking that the court found sufficient in *Smith* is conceptually indistinguishable from the State's evidence here. In *Smith*, a college student had ordered and paid by check for copyrighted software on multiple occasions, proceeded to copy both the software and instruction manuals upon receipt, and then stopped payment on his checks and returned the software either as an unauthorized purchase or as unusable on his computer. The manufacturer of one of the software programs discovered the student's practice and complained, resulting in the student being charged with theft by taking. The Supreme Court implicitly held that to convict a defendant of theft by taking, the item wrongfully taken could be one that the victim voluntarily delivered to the defendant.

Here, the State proved that what was wrongfully obtained by Ms. Wright were COPES payments voluntarily made in response to her telephonic invoices. In light of *Smith*, that evidence was sufficient.

## II. Sufficiency of Evidence: Medicaid Fraud

Ms. Wright's second assignment of error is to her Medicaid fraud convictions and is also based on a contention that the State charged the wrong crime. RCW 74.09.230(1), under which Ms. Wright was charged, makes it a crime to knowingly make or cause to be made any false statement or representation of a material fact *"in any application for any payment"* under a medical care program authorized under chapter 74.09 RCW.

8

(Emphasis added.) Subsection (2) of that statute criminalizes knowingly making or causing to be made any false statement or representation of a material fact *"for use in determining rights to such payment,"* or knowingly falsifying, concealing, or covering up a material fact "in connection with such application or payment." (Emphasis added.) Ms. Wright argues that, plainly read,

> [s]ection (1) criminalizes the falsification of the actual request for payment, i.e. a false statement, bill, or invoice for services, whereas section (2) criminalizes the falsification of information used in determining one's eligibility to participate in a given state-funded medical care program.

Br. of Appellant at 21.

Ms. Wright argues that the State's evidence demonstrated only that the time sheets she was asked to prepare after the fact were not accurate—but since those time sheets were never offered or relied upon as her application for payment, they cannot establish a crime. She concedes that the State could prove a violation of subsection (1) by proving that she made knowingly false claims in her telephonic invoices submitted during the charging period, but argues "[t]he State provided no evidence that would lead a rational jury to reach such a conclusion." *Id.* at 22.

The State's position is that Ms. Wright's criminal acts were, indeed, her submission of the 10 telephonic invoices during the charging period, each seeking payment for 188 hours of in-home care for her mother. The jury found Ms. Wright guilty of making false statements on or about 10 dates: May 31, June 30, July 31, August 31,

9

September 30, October 31, November 30, and December 31 of 2007; and January 31 and February 29 of 2008. Those were the dates on which Ms. Wright submitted telephonic invoices. There is no dispute over the criminal acts on which the State relied. It characterizes the time sheets prepared after the fact not as the crime, but as circumstantial evidence that the earlier telephonic invoices were knowingly false.

The jury was instructed that circumstantial evidence and direct evidence are equally reliable and that the term "circumstantial evidence" refers to evidence "from which, based on your common sense and experience, you may reasonably infer something that is at issue in this case." CP at 184. Evidence that Ms. Wright was unable to provide a credible account of the times that she worked during the charging period when asked to do so is not direct evidence of crime, but it is certainly circumstantial evidence from which the jury could infer that her telephonic invoices were false when made. Other circumstantial evidence that Ms. Wright's telephonic invoices were false included evidence that the hours worked by Ms. Wright for her private employer were during the time of day that Ms. Siegfried was most likely to need the in-care services that Ms. Wright was supposed to be providing. It included the State's surveillance evidence conflicting with the hours Ms. Wright allegedly provided in-home care. It included testimony from neighbors and other witnesses who had seen Ms. Siegfried able to walk unassisted, baby-sit her grandchildren, walk her grandchildren the several blocks to

school, and perform basic household tasks, all of which cast doubt on whether Ms. Siegfried had ever needed a 188-hour per-month level of care in the first place.

An evidence sufficiency challenge admits the truth of the State's evidence and any inferences the jury may reasonably draw from it. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). The State's evidence was clearly sufficient.

### III. Concurrent Charges and Equal Protection

Ms. Wright next contends that the statutes criminalizing first degree theft and Medicaid fraud are concurrent in the sense that a violation of the more specific Medicaid statute constitutes a violation of the general theft statute in every instance. According to her, one cannot make a knowingly false statement in an application for payment under a medical care program without thereby wrongfully obtaining or exerting unauthorized control over the money. She argues that it is a denial of equal protection for a prosecutor to charge a crime under a general statute where a more specific statute prohibits the same conduct, yet carries a different penalty, citing *State v. Alfonso*, 41 Wn. App. 121, 125-26, 702 P.2d 1218 (1985). *Alfonso* and cases like it reason that the principle of equality before the law is inconsistent with the existence of a power in a prosecuting attorney to elect, from person to person committing an offense, which degree of proof to apply to his or her particular case. *See State v. Zornes*, 78 Wn.2d 9, 24, 475 P.2d 109 (1970). She asks that we reverse the first degree theft conviction with directions to the trial court to dismiss the charge.

11

*Alfonso*'s characterization of statutory concurrency as creating an equal protection issue is no longer good law, at least to the extent it was based on the federal constitution. *Zornes*, and by extension, *Alfonso*, was abrogated by the United States Supreme Court's decision in *United States v. Batchelder*, 442 U.S. 114, 99 S. Ct. 2198, 60 L. Ed. 2d 775 (1979) insofar as it held that equal protection under the Fourteenth Amendment was violated by statutes defining the same offense but prescribing different punishments. As explained in *City of Kennewick v. Fountain*, 116 Wn.2d 189, 193, 802 P.2d 1371 (1991), there is not an appreciable difference between the discretion a prosecutor exercises when deciding whether to charge under different statutes having different elements and the discretion he or she exercises when choosing to charge one of two statutes with identical elements. The discretion exercised "does not empower the government to predetermine ultimate criminal sanctions." *Id.*

The State recognizes that the assignment of error may raise an issue of statutory construction, since "[i]t is a well established rule of statutory construction that 'where a special statute punishes the same conduct which is punished under a general statute, the special statute applies and the accused can be charged only under that statute.'" *State v. Shriner*, 101 Wn.2d 576, 580, 681 P.2d 237 (1984) (quoting *State v. Cann*, 92 Wn.2d 193, 197, 595 P.2d 912 (1979)). In order for statutes to implicate this statutory construction concern, the general statute must be violated every time the special statute has been violated. *Id.* We determine whether two statutes are concurrent by examining

12

the elements of each to determine whether a person can violate the special statute without necessarily violating the general statute. *State v. Heffner*, 126 Wn. App. 803, 808, 110 P.3d 219 (2005).

First degree theft requires proof that the defendant wrongfully obtained or exerted unauthorized control over another's property valued at more than the statutory minimum, with the intent to deprive that person of the property. RCW 9A.56.030(1)(a); RCW 9A.56.020(1)(a). The Medicaid false statement with which Ms. Wright was charged requires proof that the defendant knowingly made or caused to be made any false statement or representation of a material fact when applying for payment under a medical care program. RCW 74.09.230(1).

One can make a false statement in applying for a payment yet not receive the payment. If so, no theft has occurred. RCW 74.09.230(1); RCW 9A.56.020(1)(a). At the same time, the false statement of material fact knowingly made in applying for a Medicaid-funded payment completes the crime of Medicaid false statement. Because the first degree theft statute is not violated every time the Medicaid fraud statute is violated, the State was free to charge Ms. Wright with first degree theft in addition to Medicaid fraud.

IV. Same Criminal Conduct

Finally, Ms. Wright argues that the trial court erred in failing to treat her convictions of first degree theft and Medicaid fraud as the same criminal conduct. In the

13

trial court, she argued that because the State elected to aggregate 10 payments she received in order to arrive at the dollar amount required for first degree theft, the Medicaid fraud occurred during the same, roughly 10-month time frame as the theft. Contending that the Medicaid fraud was the "same criminal conduct" as the theft in all other relevant respects, she argued that her offender score should be zero. The State disagreed, taking the position that the crimes were not the same criminal conduct and her offender score was 10. The sentencing court adopted the State's position.

Except in the case of serious violent crimes, the Sentencing Reform Act of 1981, chapter 9.94A RCW, directs a trial judge who is sentencing a defendant for multiple current offenses to count other crimes being sentenced as part of the offender score for each other crime, but then have the sentences for the crimes run concurrently with each other. RCW 9.94A.589(1). An exception exists if a trial judge finds that multiple current offenses constituted the "same criminal conduct." In that instance, the multiple offenses are to be treated as one crime for scoring purposes. RCW 9.94A.589(1)(a). "Same criminal conduct" for this purpose "means two or more crimes that require the same criminal intent, are committed at the same time and place, and involve the same victim." *Id.* If any element is missing, the crimes do not constitute the same criminal conduct. *State v. Maxfield*, 125 Wn.2d 378, 402, 886 P.2d 123 (1994). "[B]ecause a finding by the sentencing court of same criminal conduct favors the defendant, 'it is the defendant who must establish [that] the crimes constitute the same criminal conduct.'" *State v. Johnson*,

14

___ Wn. App. ___, 320 P.3d 197, 203 (2014) (alteration in original) (quoting *State v. Graciano*, 176 Wn.2d 531, 539, 295 P.3d 219 (2013)), *petition for review filed*, No. 90276-3 (Wash. May 27, 2014). We review an offender score calculation de novo but review a determination of what constitutes the same criminal conduct for abuse of discretion or misapplication of the law. *State v. Mutch*, 171 Wn.2d 646, 653, 254 P.3d 803 (2011).

Ms. Wright argues that it is "undisputed" that the crimes of which she was found guilty involved the same criminal intent (theft by color or aid of deception) and the same victim (the State), and "obvious" that the crimes all occurred in the same place. Br. of Appellant at 28. The only issue, she contends, is whether the crimes occurred at the same time. She argues that the 10 counts of Medicaid fraud occurred over the same date range (June 4, 2007 and April 2, 2008) as the acts of theft that the State elected to aggregate for 1 count of first degree theft.

While the State disputes Ms. Wright's contention that the crimes constitute the same criminal conduct on the merits, it also makes a threshold argument that Ms. Wright was sentenced as a first-time offender under RCW 9.94A.650 and may not appeal her sentence. Under RCW 9.94A.585(1), "a sentence imposed on a first-time offender under RCW 9.94A.650 shall . . . be deemed to be within the standard sentence range for the offense and shall not be appealed." Ms. Wright's brief does not challenge her sentence, however; it challenges the "same criminal conduct" determination, which, having been

15

made by the sentencing court, will bind any future court should she be charged and convicted of other crimes. RCW 9.94A.525(5)(a)(i); *Johnson*, 320 P.3d at 202-03. Given the nature of her challenge, RCW 9.94A.585(1) does not preclude appeal.

Turning to the merits, the State will concede only that the victim was the same. As to intent, the relevant inquiry is to what extent the criminal intent, when viewed objectively, changed from one crime to the next. *State v. Tili*, 139 Wn.2d 107, 123, 985 P.2d 365 (1999). "This, in turn, can be measured in part by whether one crime furthered the other." *State v. Vike*, 125 Wn.2d 407, 411, 885 P.2d 824 (1994). In *State v. Dunaway*, 109 Wn.2d 207, 743 P.2d 1237, 749 P.2d 160 (1987), the Washington Supreme Court held that kidnapping and robbery constituted the same criminal conduct where the objective of abducting the victim was to commit robbery. While the State argues that the criminal intent in this case changed from the Medicaid fraud to the theft, we are not persuaded. Viewed objectively, Ms. Wright's Medicaid fraud furthered her theft in the same way that kidnapping furthered robbery in *Dunaway*.

We agree with the State, however, that Ms. Wright fails to establish that the crimes occurred at the same time and place. As to the time when the crimes occurred, the charging decision to aggregate Ms. Wright's receipt of a series of payments as a common scheme or plan does not change the fact that her theft was not continuous but involved a series of transactions taking place on discrete dates—and those dates were consistently several days after she submitted the corresponding false telephonic invoice. Even former

16

RCW 9A.56.010(18)(c), which defines "value" to permit the State to aggregate third degree thefts in order to charge first degree theft, recognizes that what is being aggregated is "*any series of transactions* which constitute theft." (Emphasis added.)

As to the place where the crimes occurred, the State correctly points out that Ms. Wright has not identified any evidence that the crimes were committed in the same place. It submits that "it defies common sense to suppose she placed the calls from her bank, the place she wrongfully obtained the funds." Br. of Resp't at 34.

Because Ms. Wright fails to establish that the Medicaid fraud and theft were committed at the same time and place, the trial court's refusal to treat them as the same criminal conduct was not error.

Affirmed.

A majority of the panel has determined that this opinion will not be printed in the Washington Appellate Reports but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, C.J.

WE CONCUR:

_____
Korsmo, J.

_____
Fearing, J.

17